IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Edward McVay, | ) | C/A No.: 0:12-1693-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MSI-Forks Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment discrimination case, Edward McVay ("Plaintiff") is suing his former employer MSI-Forks Inc. ("Defendant") for race discrimination pursuant to 42 U.S.C. § 1981.  This matter comes before the court on Defendant's motion for summary judgment.  [Entry #12].  The motion for summary judgment having been fully briefed [Entries #16, #19], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation ("Report") is entered for the district judge's consideration.  For the reasons that follow, the undersigned recommends the district court grant the motion.

I.      Factual and Procedural Background

A.      Plaintiff's Employment History

Plaintiff began working as a welder for Defendant on June 17, 2002.  [Entry #12-4 at 2].  As part of his job duties, he was required to maintain a neat work area and be able

to pass a welding test.  Pl. Dep. 64:9–18 [Plaintiff's deposition may be found at Entry #12-8].

In a performance evaluation dated May 10, 2006, Plaintiff's overall performance was described as commendable.  [Entry #12-5 at 2].  In the comments portion of the evaluation, the evaluator noted that Plaintiff's work had been adequate during the reporting period and that he had an easy-going demeanor.  *Id.*  The evaluator also noted that although Plaintiff's overall quality of work was "pretty good," he had made some "costly mistakes in the past six months."  *Id.* at 3.

On June 10, 2010, Plaintiff was given a verbal warning after failing a weld test. [Entry #12-4 at 2].  It was noted that Plaintiff failed his September 2007 weld test three times.  *Id.*  Plaintiff was advised that there would be no more re-takes of the test and that failure could lead to dire consequences.  *Id.*  Plaintiff failed another weld test on August 6, 2010.  [Entry #12-4 at 3–4].

In a performance evaluation dated June 3, 2011, Plaintiff's direct supervisor, Edward Bengivenga,[1] noted that Plaintiff met expectations overall, but needed improvement in the areas of accountability, decision-making, appearance of work area, and job knowledge.  [Entry #12-2 at 2–4].  Bengivenga indicated that "quality and cleanliness need[ed] improvement" and that he needed Plaintiff "to concentrate on producing a quality product everyday!"  *Id.* at 3.

Also on June 3, 2011, Bengivenga issued Plaintiff a written warning for a poor/failed weld.  [Entry #12-3 at 2].  The warning indicated that Plaintiff welded a set of

---

[1] Defendant terminated Bengivenga on February 3, 2012.  Bengivenga Dep. 8:7–20 [Bengivenga's deposition may be found at Entry #12-9].

forks ("Kalmar Forks") on February 3, 2011, that had been returned due to field failure.

*Id.*  Bengivenga wrote that CQI inspection revealed that Plaintiff applied the substandard

weld, that such a weld was unacceptable, and that failure to apply welds in accordance

with Defendant's processes and procedures was a major safety issue for the end user.  *Id.*

Plaintiff signed the warning.  *Id.*  Bengivenga explained that given the way the forks were

used, a faulty weld could cause a load to fall from up in the air and could potentially

injure or kill someone.  Bengivenga Dep. 52:11–17.

> In a memorandum dated July 14, 2011, Bengivenga stated as follows:
>
> I have kept Edward McVay from welding since 06/03/2011.  In place of welding I have put him in the Mod Shop to cut and Plate forks for other welders.  Edward McVay has repeatedly not followed procedures on the cutting saw and plating cell which has led to re-work after re-work.
>
> In addition to the above in the past several weeks Edward has become very destructive to tools and fixtures used in our processes to provide quality products to our customers.  This destruction of company property cannot and will not be tolerated.
>
> Just today I asked Edward McVay to wait for me to plate the last job in cue for Kalmar.  Edward went ahead and fitted the forks up without me.  The forks were not fitted properly and are out of tolerance in accordance to our customer's standard.  Our process and procedures where [sic] not followed.  This job will require re-work as well.
>
> Over the past four years Edward has struggled to complete welder certification as required to maintain a welder position at MSI-Forks.  It has taken multiple attempts to receive a satisfactory result.  Being a welder at MSI-Forks for over eight years this requirement shouldn't be a stumbling block.
>
> I have repeatedly pulled Edward aside to find out what is going [on], what is the source of this behavior.  He just shrugs it off, and tells me he has a lot on his mind.  Edward has demonstrated a major lack of concern.  This attitude is alarming to say the least, and allowed to continue will manifest itself in the entire crew.

[Entry #12-7 at 2].  After reviewing the memorandum, Tom Wolfe, the general manager, instructed Bengivenga to terminate Plaintiff.  Bengivenga Dep. 14:20–15:6.  Bengivenga stated that he did not think Plaintiff should be terminated because he had a lot of experience and knowledge.  Bengivenga Dep. 15:9–24.  Wolfe disputes that Bengivenga ever expressed that he did not feel that termination was the right decision.  Wolfe Dep. 84:13–16 [Wolfe's deposition may be found at Entry #13-1].

At Wolfe's direction, Plaintiff was terminated on July 14, 2011, for the poor welds associated with the Kalmar Forks identified in the warning dated June 3, 2011.  [Entry #12-6 at 2].  In a handwritten note associated with Plaintiff's termination, Wolfe wrote:

> Sad to see it has come to this.  Edward has been counseled numerous times by both the production supervisor and myself.  When counseled in the past his performance would improve for the short term but he would backslide to unacceptable performance levels.  This last episode is the straw that broke the camel's back.  He has been counseled and warned of the consequences of poor weld quality before.  Although a hard decision to make, it was the best for the company.

[Entry #12-10 at 2].

Plaintiff testified that he did not remember receiving a warning for a bad weld on June 3, 2011; stated he was still welding at the time of his termination; and denied the occurrence of any of the events in Bengivenga's memorandum.  Pl. Dep. 23:8–25:16.  Plaintiff further testified that he requested proof of the defective weld, but was never given any.  Pl. Dep. 43:3–7.  He stated that when he was terminated, Bengivenga told him that Wolfe had ordered the termination.  Pl. Dep. 42:21–43:2.

Plaintiff alleges that although he had been approved to take vacation the week following the week in which he was terminated, he was never paid for that vacation time.

4

Pl. Dep. 44:20–45:4.  He stated that, when asked about it, Wolfe responded that Plaintiff did not get paid for the vacation time because he had been terminated.  Pl. Dep. 45:5–14. Wolfe testified that Plaintiff was not paid for his vacation time because the employee handbook has a stipulation about accrued vacation.  Wolfe Dep. 84:17–22.

B.     Allegations Related to Alleged Discrimination

Plaintiff testified that in January 2009, Wolfe stated that Barack Obama would not make a good president because he is black.  Pl. Dep. 34:11–35:14.

Plaintiff alleges that in a birthday celebration at work in August 2010, he was given an Oreo cookie ice cream cake rather than a plain ice cream cake.  Pl. Dep. 35:21–36:6.  He testified that Wolfe purchased the cake.  Pl. Dep. 36:7–9.  Plaintiff believed he was given the cake because of his race and that the cake suggested that he was "black on the outside and white on the inside."  Pl. Dep. 35:21–36:6.  Plaintiff testified that when he received the cake, he said, "What's this?  What you all trying to prove? I know I'm the only black in here."  Pl. Dep. 36:22–37:4.  He further testified that no one else said anything racist or alluded to anything racist surrounding the cake, but that they laughed at his comment.  Pl. Dep. 37:25–38:3.  Both Wolfe and Bengivenga testified that the cake was also for Wolfe's birthday.  Wolfe Dep. 89:7–22; Bengivenga Dep. 52:23–53:2.

Plaintiff testified that every time he drove a different vehicle to work, Wolfe would comment on the vehicle and say, "I see who's making the money."  Pl. Dep. 38:13–20.  Plaintiff stated that that when he drove his son's Mercedes Benz to work, Wolfe commented, "You're driving a Mercedes Benz today."  Pl. Dep. 38:21–25. Plaintiff allegedly responded, "Why are you always picking on me about what I drive?"

Pl. Dep. 39:1–5.  He stated that he complained about the incident to Bengivenga, who allegedly stated, "Man, I don't know why he keeps bothering you."  Pl. Dep. 39:9–20. Wolfe testified that he recalled making comments to Plaintiff about the cars he drove including, "Nice car.  I see who's making the money now."  Wolfe Dep. 90: 11–19. Wolfe further testified that he made comments about everybody's cars that were in the parking lot.  Wolfe Dep. 90:6–10.

In addition to the comments about cars, Wolfe also commented to Plaintiff near the end of his employment with Defendant that Plaintiff made too much money for what he did.  Wolfe Dep. 94:5–11.

Plaintiff testified that Wolfe always called him "big dick" ("Nickname").  Pl. Dep. 40:3–5.  He stated that Wolfe used the Nickname in front of other employees and did not have nicknames for anyone else.  Pl. Dep. 40:8–16.  Bengivenga testified that Wolfe used the Nickname almost every day and that Plaintiff would occasionally respond, "Yeah, you're a big dick."  Bengivenga Dep. 32:18–24, 34:13–19.  Bengivenga told Wolfe on more than one occasion that he thought the Nickname was inappropriate and that Plaintiff found it offensive.  Bengivenga Dep. 35:19–36:18.  Because Wolfe was the general manager and human resources manager, Bengivenga described him as a "gatekeeper" and testified that there was no one else that he could have talked to regarding the Nickname. Bengivenga Dep. 36:19–37:4.

II.     Discussion

    A.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255.

    B.     Analysis

Plaintiff states a single cause of action for race discrimination pursuant to 42 U.S.C. § 1981.[2]   Section 1981(a) states in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  Because the "at-will employment relationship is contractual . . . such relationships may therefore serve as

---

[2]  Plaintiff's complaint stated his sole cause of action as one for "race discrimination/retaliation," but alleged no facts in support of a retaliation claim. [Entry #1-1 at 5].  Defendant moved for summary judgment on the retaliation claim [Entry #12-1 at 14–15], but Plaintiff failed to address that claim in his response.  Consequently, the undersigned concludes that Plaintiff never intended to state a claim for retaliation or, if he did so intend, has now abandoned that claim.  In the event Plaintiff continues to assert a retaliation claim, he has failed to provide sufficient evidence to state a prima facie claim of retaliation.  *See* Pl. Dep. 47:19–49:5 (testifying that he was paid more than other employees and "they couldn't stand that because of [him] being black" so they terminated him in retaliation).

predicate contracts for § 1981 claims." *Spriggs v. Diamond Auto Glass, II*, 242 F.3d 179, 183 (4th Cir. 1999), *quoting Spriggs v. Diamond Auto Glass*, *I*, 165 F.3d 1015, 1018–1019 (4th Cir. 1999).

Discrimination claims brought under § 1981 follow the same proof structure as claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). *Gairola v. Com. of Va. Dept. of Gen. Servs.*, 753 F.2d 1281, 1285–86 (4th Cir. 1985). In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] Under the *McDonnell Douglas* framework, Plaintiff has the initial burden of establishing a prima facie case of discrimination. To establish a prima facie case, Plaintiff must show (1) that he is a member of a protected class; (2) that he was qualified for his job and his job performance was satisfactory; (3) that, in spite of his qualifications and performance, he was fired; and (4) that the position remained open to similarly-qualified applicants after his dismissal. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455, 457–58 (4th Cir. 1989) (citations omitted).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Williams*, 871 F.2d at 455–56. This is merely a burden of production, not of persuasion. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

---

[3] Plaintiff does not assert that there is any direct evidence of discrimination in this case.

Once Defendant has met its burden of production by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non.*"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination.  *Reeves*, 530 U.S. at 143.  Throughout the burden-shifting scheme set forth in *McDonnell Douglas*, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.  Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against him.

1.      Plaintiff has failed to establish a prima facie case.

Defendant argues that Plaintiff has failed to establish a prima facie case of race discrimination under § 1981 because he cannot demonstrate that he was qualified for the job at the time of his termination.  [Entry #12-1 at 10–14].  In support, Defendant relies on Plaintiff's repeated weld test failures [Entry #12-4 at 2]; his evaluations documenting that he had made costly mistakes [Entry #12-5 at 3] and needed to concentrate on making a quality product everyday [Entry #12-2 at 3]; and on the documentation related to the poor/failed welds discovered in June 2011 [Entries #12-3 at 2].  Defendant also relies on Bengivenga's memorandum dated July 14, 2011, describing Plaintiff's failure to follow procedures, his destruction of company property, and his major lack of concern that, if allowed to continue, would manifest itself in the entire crew.  [Entry #12-7 at 2].

9

In response, Plaintiff asserts that his admittedly substandard performance on some weld tests was due to the poor quality of the metal used [Entry #16 at 11]; however, he offers no evidence that the metal was of poor quality or that other employees also had trouble passing the weld tests because of the metal quality. Plaintiff further argues that he "consistently throughout the course of his employment at MSI, met the expectations of his employer" based on his performance reviews of "meets expectations" or "commendable." *Id.* at 12. In so arguing, he fails to address the "needs improvement" ratings in specific areas on the evaluations and the written comments noting that he had made costly mistakes and needed to focus on his work quality.

With regard to the Kalmar Forks, Plaintiff cites to Bengivenga's testimony to support the argument that it is possible that he did not even weld them. *Id.* at 12–13. Bengivenga testified that all the evidence pointed to Plaintiff having welded the forks, but admitted there was a slim possibility that someone else could have welded them. Bengivenga Dep. 30:21–31:3. He stated that everyone welds a certain way "almost like a signature" and that the welds in question had characteristics consistent with Plaintiff's welding style. Bengivenga Dep. 24:15–26:19. Thus, it is apparent from Bengivenga's testimony that he believed the substandard welds on the Kalmar Forks were attributable to Plaintiff.

Plaintiff fails to offer any additional argument or evidence to support his contention that he was performing satisfactorily at the time of his termination. In determining satisfactory job performance, it is the perception of the decisionmaker that is relevant, not the self-assessment of the plaintiff. *King v. Rumsfeld,* 328 F.3d 145, 149

(4th Cir. 2003) (stating that plaintiff's own testimony of satisfactory job performance cannot establish a genuine issue as to whether he was meeting his employer's expectations in a race discrimination case) (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996)).    An employer's expectations of its employees are "legitimate" when they are honestly held; whether the employee agrees with those expectations is not the test.  *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 30 (2d Cir. 1997) (stating that "a plaintiff must satisfy the employer's honestly-held expectations").  In this context, the term "legitimate" means that expectations cannot be a "sham designed to hide the employer's discriminatory purpose."  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006).

Because Plaintiff's less-than-satisfactory job performance is well documented and he has failed to demonstrate that Defendant's expectations of him were not honestly held, the undersigned recommends a finding that Plaintiff has failed to satisfy the second element of a prima facie case of discrimination.    On that basis, the undersigned recommends that Defendant's motion for summary judgment be granted.

        2.      Plaintiff has failed to establish discrimination *vel non.*

Even if Plaintiff were able to establish a prima facie case of discrimination, summary judgment would still be appropriate because Defendant has proffered a legitimate, nondiscriminatory reason for his dismissal, and Plaintiff has failed to submit evidence that the reason is merely pretext for discrimination.  Defendant asserts that it terminated Plaintiff based on well-documented performance issues.  [Entry #19 at 2].  The burden, therefore, shifts back to Plaintiff to demonstrate by a preponderance of the

evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143. "At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (internal citations omitted). In order to satisfy this burden, it is not sufficient for Plaintiff to show merely that Defendant's asserted reason is false; rather, Plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center*, 509 U.S. at 515–16. Here, the undersigned finds that Plaintiff has failed to identify a genuine dispute of material fact as to whether his termination was the result of intentional discrimination.

Plaintiff bases his pretext argument on evidence that he claims raises an inference of discrimination. He first contends that he "consistently met the performance standards of MSI" [Entry #16 at 13]; however, this argument is unavailing for the reasons stated in the previous section of this Report.

Plaintiff next argues that his supervisor, Bengivenga, testified that Plaintiff should not have been terminated. *Id.* The undersigned finds that Bengivenga's memorandum from the date of Plaintiff's termination supports the legitimate, non-discriminatory reason proffered by Defendant. Furthermore, Bengivenga's testimony does not provide any evidence that Plaintiff's termination was racially motivated. Thus, Bengivenga's opinion as to whether Plaintiff should have ultimately been fired is irrelevant to the pretext analysis.

Plaintiff also argues that pretext is established by Wolfe's statement regarding President Obama; the Nickname used by Wolfe; Wolfe's comments regarding Plaintiff's cars and salary; and the Oreo cake that Plaintiff received on his birthday.  Wolfe allegedly made the statement about President Obama two and a half years before Plaintiff's termination and said it only one time.  Thus, the undersigned finds that the comment does not establish pretext.  *See, e.g., Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." (internal quotation marks and alteration omitted)), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

With regard to the Oreo cake incident and the comments about his cars and salary, Plaintiff has offered only his own belief that these incidents were related to his race. Such allegations, without any evidentiary support, are insufficient to survive summary judgment.  *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (finding that "neither unsupported speculation, nor evidence that is merely colorable or not significantly probative will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered") (internal citations omitted).

While Wolfe's nickname for Plaintiff was inappropriate, there is no evidence corroborating Plaintiff's allegation that the Nickname was motivated by a racial stereotype.[4] Rather, the only explanation in the record is Wolfe's testimony that Plaintiff first called Wolfe a "big dick" because he was a strict disciplinarian and that Wolfe thereafter called Plaintiff by the Nickname as a joke. Wolfe Dep. 92:2–11. Because the Nickname is not unambiguously racial in nature and Plaintiff has failed to demonstrate it was racially motivated, the undersigned concludes that it is insufficient to establish pretext.

In support of his pretext argument, Plaintiff also asserts that Wolfe and coworker Dan Parsons worked together to give him the jobs that Parsons did not want to perform. Plaintiff's only testimony on this issue was that he always felt a "racial vibe" while working for Defendant and that the basis for the vibe was that he was given dirty jobs like cleaning up the yard. Pl. Dep. 51:14–53:2. He further testified, however, that other employees "most definitely" cleaned the yard and all of them were white. Pl. Dep. 51:18–53:2. Consequently, Plaintiff's argument regarding job assignments fails to demonstrate pretext.

---

[4] Plaintiff states in his response brief that "Bengivenga testified that his perception of the nickname that Wolfe used for Plaintiff referred to [the] stereotype" that African-American men have large penises. [Entry #16 at 5]. At his deposition, Bengivenga was asked whether he ever related Wolfe's use of the Nickname to the stereotype. Bengivenga Dep. 32:25–33:15. He responded that the "thought kind of crossed [his] mind," but that he would put it out of his mind thinking that it could not mean that. *Id.* He went on to testify that Wolfe had previously stated that "everyone's green, they all represent money" and that Wolfe did not really care about race or creed. *Id.* In context, Bengivenga's testimony does not, as Plaintiff alleges, provide evidence of discriminatory animus behind the Nickname.

14

Finally, Plaintiff contends that Wolfe's decision to change the vacation accrual policy after all hourly employees other than Plaintiff had gone on summer vacation is evidence of pretext. [Entry #16 at 15]. Defendant denies that the policy changed and, in any event, notes that it approved Plaintiff's June 23, 2011, request for paid time off ("PTO"). [Entries #19 at 6–7; #19-1]. It is unclear what effect, if any, the alleged change in PTO policy would have had on Plaintiff had he not been terminated. This is irrelevant, however, because there is no evidence suggesting that the alleged change was racially motivated, and this allegation, therefore, does not establish pretext.

Not only has Plaintiff failed to establish pretext, he has also failed to present any evidence tending to show that Defendant did not believe its stated reason for firing him to be true. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217–18 (4th Cir. 2007) (concluding that no reasonable juror could conclude that the decision maker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decision maker] did not honestly believe that the threats were made" and noting that "'[i]t is the perception of the decisionmaker which is relevant.'") (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435 (4th Cir. 1998)); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.") (internal quotation marks and citations omitted).

Because Plaintiff has failed to produce any evidence showing that Defendant considered his race when it terminated him, the undersigned recommends that the district court grant Defendant's motion for summary judgment.

15

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment [Entry #12] be granted.

IT IS SO RECOMMENDED.

July 23, 2013                                    Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).